UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK ORTEGOZA, *et al.*, <br>         Plaintiffs, <br> v. <br> PETER KHO, M.D., *et al.*, <br>         Defendants. | Case No. 12-cv-529-L(KSC) <br><br> **ORDER GRANTING MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT [DOC. 41]** |

On March 1, 2012, Defendant United States of America removed this medical-malpractice action to this Court from the San Diego Superior Court. Plaintiffs Frank Ortegoza and Portia Ortegoza, who were married at all times relevant to this complaint, were both patients of Defendant Peter Kho, M.D. This action arises from Dr. Kho's extramarital relationship with Mrs. Ortegoza. After proceeding under two separate operative complaints, the Court ordered Plaintiffs to request leave to file a single consolidated complaint. Plaintiffs now move for leave to file a consolidated Third Amended Complaint ("TAC"). Dr. Kho opposes.

The Court found this motion suitable for determination on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d.1). (Doc. 45.) For the following reasons, the Court **GRANTS** Plaintiffs' motion for leave to file a TAC.

# I.  BACKGROUND[1]

Dr. Kho was Mrs. Ortegoza's primary care physician from approximately 2003 to May 2010. (PTAC ¶ 11.) In 2006, Dr. Kho also became Mr. Ortegoza's primary care physician. (*Id.*) During all times relevant to the TAC, Mr. and Mrs. Ortegoza were married and had children together. (*Id.* ¶¶ 9, 43.) Also, during this time period, Dr. Kho was a California-licensed physician and surgeon, providing primary-care services to patients at the Navy Medical Center San Diego ("NMCSD") TRICARE Outpatient Clinic in Chula Vista, California. (*Id.* ¶ 10.) Mr. Ortegoza is a disabled Navy veteran, and Mrs. Ortegoza worked in the Medical Records Department at the TRICARE facility. (*Id.* ¶¶ 9, 23.)

## A.  Allegations Pertaining to Mrs. Ortegoza

Between July 2007 and October 2009, Mrs. Ortegoza sought medical care at the NMCSD from TRICARE doctors, including Dr. Kho. (*See* PTAC ¶¶ 12–22.) In August 2007, Dr. Kho diagnosed Mrs. Ortegoza with "Reaction to Chronic Stress" and noted that "she was having anxiety and problems at home because of Frank's 'dysphoric mood and verbal abuse.'" (*Id.* ¶ 13.) Dr. Kho advised Mrs. Ortegoza to go to family counseling and prescribed Klonopin. (*Id.*) In June 2008, Dr. Milnes Henson diagnosed Mrs. Ortegoza with "Anxiety" and noted that she was "under a lot of stress due to family issues." (*Id.* ¶ 14.) A month later, Mrs. Ortegoza saw that same doctor to request a referral for family counseling. (*Id.* ¶ 15.) She had reported that Mr. Ortegoza had "pulled their daughter on the ground by the hair and later hit her daughter." (*Id.*) The police and child protective services were called. (*Id.*) Also, Mrs. Ortegoza stated to the doctor that Mr. Ortegoza had hit her approximately five times during their marriage. (*Id.*) Dr. Henson diagnosed Mrs. Ortegoza with "Adult Maltreatment (Victim)." (*Id.*)

In July 2008, a social worker with the NMCSD contacted Mrs. Ortegoza after Dr. Henson reported the domestic violence. (PTAC ¶ 16.) The social worker noted in Mrs. Ortegoza's

---

[1] Plaintiffs include a copy of the Proposed Third Amended Complaint ("PTAC") to their motion. (Doc. 41-7.)

medical record that she wanted a representative from Child Welfare Services to encourage Mr. Ortegoza to pursue family counseling and parenting classes, and that she also expressed an interest in couples therapy for herself and Mr. Ortegoza. (*Id.*)

In October 2008, Mrs. Ortegoza was experiencing anxiety symptoms because of Mr. Ortegoza's verbal and physical abuse. (PTAC ¶ 23.) She was crying in the hallway at the TRICARE facility, and Dr. Kho brought her into his office and closed the door. (*Id.*) Plaintiffs allege that with the understanding that Dr. Kho was acting as Mrs. Ortegoza's doctor, "she told him during the October 2008 discussion in his office about the problems she was having in her marriage, specifically the verbal and physical abuse by Frank, and said she needed Frank to 'love and respect her.'" (*Id.* ¶ 24.) Weeks later, in November 2008, Dr. Kho called Mrs. Ortegoza, but she missed his call. (*Id.* ¶ 25.) Mrs. Ortegoza called back, and he talked about the stress that she was experiencing, referring to their October 2008 discussion. (*Id.*) Dr. Kho then asked her to go to the beach with him, "saying they could walk together and she could get the stress out," also adding that "it would help her relax." (*Id.*) Plaintiffs allege that based on that explanation, Mrs. Ortegoza thought the proposed outing was a kind of therapy that Dr. Kho believed would help handle the stress and anxiety that she was experiencing. (*Id.*)

Between November and December 2008, Dr. Kho continued to call Mrs. Ortegoza nearly every day. (PTAC ¶ 26.) During these phone calls, he repeatedly stated, "I can give you the love and respect you deserve," and he also secretly handed her his personal email address to email him if she needed someone to talk with. (*Id.*)

A sexual relationship between Dr. Kho and Mrs. Ortegoza started shortly thereafter, beginning in January 2009 and lasting until June 2010. (PTAC ¶ 27.) During the duration of their sexual relationship, Plaintiffs allege that Dr. Kho "continued to use information he learned in the doctor-patient relationship he had with both Frank and Portia and to counsel Portia regarding her psychological and family issues, and Portia continued to provide information to Kho regarding her family and Frank." (*Id.*) Plaintiffs also allege that

//

//

> Kho told Portia that she married the wrong man, that he and not Frank could make her happy, that they belonged together, and that he wanted her to get out of her marriage. Kho stated to Portia that he wanted to move with her to the Philippines once he retired, and he stated that he would never give her the kind of stress she was experiencing from Frank and that her life would be better with him. Kho stated to Portia that he would help her in regard to the domestic violence she reported to him and would protect her from future abuse. In mid-May 2009, he gave Portia a photo and listing of a property in the Philippines where he said they would live together.

(*Id.*) Throughout the sexual relationship, Dr. Kho continued to act as Mrs. Ortegoza's physician, treating her for "multiple physical and mental issues," and prescribing various prescription medications. (*Id.* ¶ 28.) Plaintiffs allege that "[l]ater, multiple physicians informed [Mrs. Ortegoza] that she should not take all of these medications contemporaneously." (*Id.*)

Shortly after they had sex for the first time in late January 2009, Mrs. Ortegoza informed Dr. Kho that she had just been "physically abused" by Mr. Ortegoza and had pain in her ear as a result. (PTAC ¶ 29.) In response, Dr. Kho told her to "avoid contact with Frank by staying in her bedroom and locking the door," and that "he wished he could be with her in her bedroom and wanted to express his love for her." (*Id.*) Plaintiffs allege that he also said that "he wanted to have sex with [Mrs. Ortegoza] for a second time, that he could feel her love for him, and that when they had sex for the first time it was the happiest day of his life." (*Id.*) In the following days, Mrs. Ortegoza continued to tell Dr. Kho of the ear pain, but he responded by only saying that "it would go away, take Tylenol or Motrin for the pain, and that he wanted to hug and kiss her." (*Id.*) This continued for two weeks. (*Id.*)

On February 12, 2009, Mrs. Ortegoza went to Dr. Kho for a doctor visit to address her ear pain. (PTAC ¶ 30.) Plaintiffs allege that Dr. Kho "ignored Portia's concerns about domestic violence by Frank and failed to report such abuse to law enforcement"; instead, Dr. Kho wanted to have sex with Mrs. Ortegoza in the examination room, locked the door, and told her to lie down on the examination bed. (*Id.*) She refused. (*Id.*) Plaintiffs also allege that Dr. Kho attempted to have sex with Mrs. Ortegoza during doctor visits on multiple occasions. (*Id.*) Also, Dr. Kho allegedly on two occasions gave Mrs. Ortegoza unprescribed pills, which he said "would keep her from catching an ailment that he had and from becoming sick while she was traveling." (*Id.* ¶ 31.) These pills allegedly made Mrs. Ortegoza "sick to her stomach," and on

both of the aforementioned occasions, Dr. Kho already had a hotel room reserved for them.  (*Id.*)

On another occasion in April 2009, shortly after Mrs. Ortegoza's mother passed away, Dr. Kho took Mrs. Ortegoza to a hotel room for a couple of hours to have sex.  (PTAC ¶ 32.)  He told Mrs. Ortegoza prior to having sex that it would "help relieve the stress she confided to him she was experiencing as a result of her mother's death and the verbal and physical abuse by Frank."  (*Id.*)

In mid-May 2010, Mr. Ortegoza learned of the extramarital relationship when he discovered Dr. Kho and Mrs. Ortegoza leaving a hotel room together.  (PTAC ¶ 34.)  In a subsequent email to Mrs. Ortegoza, Dr. Kho stated, "remember, we have something special together that we cherished and we cannot share it with anybody.  That's our standard response in case we get asked by anybody."  (*Id.* ¶ 35.)  In other subsequent emails, he also stated, "I believe its [sic] just a matter of time, we'll be happy together in the future[,]" and "babe, maybe its [sic] better if you open a new email address for us with more difficult name and codes[;] Your current email is too easy to open for other people to see."  (*Id.* ¶ 36.)

Shortly after learning of the relationship, Mr. Ortegoza informed the NMCSD of the relationship.  (PTAC ¶ 37.)  Dr. Kho immediately thereafter retired from the NMCSD in early June 2010 and ended the relationship with Mrs. Ortegoza.  (*Id.*)  He then stated to Mrs. Ortegoza in an email, "We still love each other, that's OK.  But, we both know that what we're doing are [sic] wrong to ourselves, to our families and to God."  (*Id.* ¶ 39.)  Plaintiffs allege that Dr. Kho also instructed Mrs. Ortegoza via email to "erase everything," including phone messages and emails between them because "one day these days all can be traced."  (*Id.*)  In further subsequent emails to Mrs. Ortegoza, Dr. Kho said, "I told you I have do this to protect you and the Navy from further investigations," and "No more communication for 5 years, give time for everyone to calm down.  Good bye for now."  (*Id.* ¶ 40.)  And in a July 2010 email, Dr. Kho instructed Mrs. Ortegoza to state to investigators that she was one of his medical assistants, which she was not, and that he had never treated her for psychological conditions, although he did.  (*Id.* ¶ 42.)

//
//

**B.     Allegations Pertaining to Mr. Ortegoza**

In 2006, Dr. Kho also became Mr. Ortegoza's primary care physican. (PTAC ¶ 46.) According to Plaintiffs, Mr. Ortegoza suffered from anxiety disorder, depression, and panic attacks; these symptoms are products of multiple factors, including his tour of duty in Desert Storm, the suicide of his brother in 2007, and his marital and family life. (*Id.*) According to NMCSD medical records, Dr. Kho treated Mr. Ortegoza until August 13, 2009. (*Id.*)

From July 2006 until August 2009, Dr. Kho diagnosed Mr. Ortegoza with numerous disorders and also prescribed numerous medications. (PTAC ¶¶ 47–50, 52–53, 67–73.) These diagnoses included "Attention-Deficit Predominantly Hyperactive–Impulsive," "Depression," "Depression with Anxiety," "Anxiety Disorder Due to General Medical Condition, Panic Attacks," "Delusional Disorder, Somatic," and "Anxiety Disorder." (*Id.*) Plaintiffs allege that Dr. Kho prescribed Paxil, Klonopin, Clonidine, Levitra, and Labetalol for Mr. Ortegoza at various points throughout this time period. (*Id.*) From July 2010 to November 2010, Mr. Ortegoza began seeing other doctors at NMCSD.[2] (*Id.* ¶¶ 75–79.) These doctors began weaning Mr. Ortegoza off of Clonidine and Labetalol. (*Id.* ¶¶ 75, 78.) They also diagnosed Mr. Ortegoza with anxiety disorder, hypertension, and Peyronie's disease. (*Id.* ¶¶ 75–76.) Plaintiffs' allegations suggest that these doctors also advised Mr. Ortegoza that the hypertension medications that he was prescribed could cause sexual dysfunction or Peyronie's disease. (*See id.* ¶ 75.)

In mid-May 2010, Mr. Ortegoza confronted Dr. Kho in the parking lot of the hotel where he observed Dr. Kho leaving a hotel room with his wife. (PTAC ¶ 59.) Shortly thereafter, Mr. Ortegoza informed the NMCSD of the extramarital relationship. (*Id.* ¶ 62.) Plaintiffs allege that the sexual relationship initiated by Dr. Kho with Mrs. Ortegoza has "significantly impacted Frank emotionally and psychologically." (*Id.* ¶ 66.)

//

---

[2] Plaintiffs allege that the records for the period between August 12, 2009 to July 1, 2010 are missing from the medical file provided by the NMCSD. (PTAC ¶ 74.)

    **C.     Procedural History**

On April 26, 2011, Plaintiffs commenced this action against Dr. Kho in the San Diego Superior Court. (Removal Notice Ex. A.) The complaint asserted two causes of action for medical malpractice and two causes of action for intentional infliction of emotional distress. On August 22, 2011, Plaintiffs filed a First Amended Complaint, asserting the same causes of action. (*Id.*)

In December 2011, Mr. and Mrs. Ortegoza independently filed notices of dissociation of counsel. (Removal Notice Ex. A.) Subsequently, Mrs. Ortegoza filed a Second Amended Complaint only as to herself, which asserted one cause of action for medical malpractice. (*Id.*) At that point, it appears that Mr. and Mrs. Ortegoza intended to proceed under separate operative complaints in this case.

On March 1, 2012, Defendants removed this action to this Court. (Doc. 1.) The next day, the United States of America filed a notice of Limited and Specific Substitution as Defendant for Peter Kho, M.D. (Doc. 2.) Defendants then filed answers to both complaints on March 7, 2012. (Docs. 3, 4.)

On October 9, 2012, the Court granted a joint motion consolidating an action Plaintiffs filed in federal court against the United States of America, *Ortegoza, et al. v. United States of America*, No. 11-cv-1957-L-KSC, with this one (Doc. 31); this action was designated as the lead case. On the same day, the Court issued an Order to Show Cause for an explanation why there should not be a single operative complaint in this matter. (Doc. 32.) Also on the same day, Mr. and Mrs. Ortegoza filed separate motions for leave fo file amended complaints. (Docs. 33–24.) After considering the parties' responses to the Order to Show Cause, the Court found that Mrs. Ortegoza's Second Amended Complaint superseded Plaintiffs' First Amended Complaint rendering it non-existent. After terminating both of the pending motions for leave to file amended complaints, the Court gave Plaintiffs the opportunity to jointly request leave to file a single operative Third Amended Complaint.

Plaintiffs now move for leave to file a consolidated Third Amended Complaint. (Doc. 41.) Dr. Kho opposes. (Doc. 46.)

7

12cv529

## II.   LEGAL STANDARD

Rule 15(a) of the Federal Rules of Civil Procedure provides that after a responsive pleading has been served, a party may amend its complaint only with the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a). "The court should freely give leave when justice so requires," and apply this policy with "extreme liberality." *Id.*; *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). However, leave to amend is not to be granted automatically. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (citing *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990)). Granting leave to amend rests in the sound discretion of the district court. *Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996).

The Court considers five factors in assessing a motion for leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of the amendment, and (5) whether the plaintiff has previously amended the complaint. *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). The party opposing amendment bears the burden of showing any of the factors above. *See DCD Programs*, 833 F.2d at 186. Of these factors, prejudice to the opposing party carries the greatest weight. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). However, absent prejudice, a strong showing of the other factors may support denying leave to amend. *See id.*

"Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). Futility is a measure of the amendment's legal sufficiency. "[A] proposed amendment is futile only if no set of facts can be proved under the amendment . . . that would constitute a valid and sufficient claim or defense." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). Thus, the test of futility is identical to the one applied when considering challenges under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. *Baker v. Pac. Far E. Lines, Inc.*, 451 F. Supp. 84, 89 (N.D. Cal. 1978); *see Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991) ("A district court does not err in denying leave to amend . . . where the amended complaint would be subject to dismissal." (citation omitted)).

## III. DISCUSSION

The issues that the parties present focus exclusively on Plaintiffs' addition of a request for punitive damages to the TAC; Dr. Kho provides no legal analysis addressing amending the complaint beyond the addition of the request for punitive damages. Dr. Kho opposes Plaintiff's motion for leave to amend the complaint on three grounds: (1) granting Plaintiffs leave to pursue punitive damages would prejudice Dr. Kho; (2) California Code of Civil Procedure § 425.13, which requires plaintiffs to obtain court approval prior to seeking punitive damages against health care providers, applies here; and (3) Plaintiffs fail to establish that there is a substantial probability that they will prevail on the claim for punitive damages pursuant to California Civil Code § 3294. The Court addresses these issues below.

### A. Prejudice to Dr. Kho

The entirety of Dr. Kho's prejudice argument is as follows: "Clearly, with the factual discovery cut-off date only three days away (January 11, 2013), Defendant would be significantly prejudiced should Plaintiffs be granted leave to claim punitive damages at such a late stage in the proceedings." (Def.'s Opp'n 4:9–11.) Dr. Kho provides nothing further—factually and legally—to explain how he would be prejudiced. Prejudice to the opposing party carries the greatest weight. *Eminence Capital*, 316 F.3d at 1052. However, Dr. Kho fails to meet his burden to show that he would be prejudiced if Plaintiffs are given leave to amend their complaint. *See DCD Programs*, 833 F.2d at 186.

### B. California Code of Civil Procedure § 425.13

"[F]ederal courts are to apply state substantive law and federal procedural law." *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). And in *Jackson v. East Bay Hospital*, 980 F. Supp. 1341 (N.D. Cal. 1997), the court addressed the issue of whether California Code of Civil Procedure § 425.13 is procedural or substantive. The court found § 425.13 to be a procedural requirement, noting that it "is essentially a method of managing or directing a plaintiff's pleadings, rather than a determination of substantive rights," and that "the California courts have themselves held

section 425.13 procedural in nature." *Jackson*, 980 F. Supp. at 1352-53.  The court also rejected the argument that the procedural requirements of § 425.13 were so "intimately bound up" with the state's substantive law that it must be applied by a federal court. *Id.* at 1352.

This Court agrees with the *Jackson* court's determination that § 425.13 is procedural and finds its analysis persuasive. *See Jackson*, 980 F. Supp. at 1352-53; *see also Steel v. City of San Diego*, 726 F. Supp. 2d 1172, 1182 (S.D. Cal. 2010) (Anello, J.) (recognizing § 425.13 is procedural).  Therefore, § 425.13 does not apply to Plaintiffs' requests for punitive damages with respect to their causes of action for medical malpractice.[3] *See Jackson*, 980 F. Supp. at 1352-53; *see also Burrows v. Redbud Cmty. Hosp. Dist.*, 188 F.R.D. 356, 361 (N.D. Cal. 1997).

## IV.  CONCLUSION & ORDER

Dr. Kho characterizes his extramarital relationship with Mrs. Ortegoza as "an office romance that blossomed into a love affair and a sexual relationship by mutual consent." (Def.'s Opp'n 10:4–17.)  He poetically continues that

> At no time did Defendant act with intent to cause injury.  Defendant's conduct, in falling in love, and doing what follows naturally thereafter, can hardly be characterized as "despicable and done with a willful and knowing disregard of the rights or safety of another".  Furthermore, the mutually consensual conduct of Defendant and Mrs. Ortegoza at various motels cannot in all seriousness be argued to have "subjected her to cruel and unjust hardship in knowing disregard of her rights."  Defendant has not committed, or been convicted, of any crime.  Falling in love is not a crime.  Falling in love is not conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.  Reasonable people understand what [it] is to fall in love.

(*Id.*)  In the words of the great Tina Turner, "what's love got to do, got to do with it"?[4]  At this point, nothing because "love is not admissible evidence."[5]  To nonchalantly and flippantly say otherwise in light of the serious allegations of misconduct discussed above is inappropriate.

---

[3] The Court need not address Dr. Kho's third ground because that argument assumes that § 425.13 applies.

[4] Tina Turner, What's Love Got to Do with It (Capitol Records 1984).

[5] *Community: The First Chang Dynasty* (NBC television broadcast May 17, 2012).

In light of the foregoing, the Court **GRANTS** Plaintiffs' motion for leave to file a TAC. (Doc. 41.) Accordingly, Plaintiffs shall file their TAC as it was attached to their motion by **May 20, 2013**.

**IT IS SO ORDERED.**

DATED: May 16, 2013

M. James Lorenz
United States District Court Judge

COPY TO:

HON. KAREN S. CRAWFORD
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL